**Michael J. GRANZEIER, et al., Plaintiffs,**

v.

**Clyde MIDDLETON, et al., Defendants.**

**Civil Action No. 96–71.**

United States District Court, E.D. Kentucky, at Covington.

Feb. 27, 1997.

Scott T. Greenwood, Greenwood & Associates, Cincinnati, OH, for Plaintiffs.

Garry L. Edmondson, Rita Ferguson, Kenton County Attorneys, Covington, KY, Stuart W. Cobb, Office of Attorney General, James J. Grawe, Office of Attorney General, Frankfort, KY, for Defendants.

## OPINION AND ORDER

BERTELSMAN, Chief Judge:

This matter is before the court on cross-motions for summary judgment. This case raises two distinct issues: (1) whether closing various courts and offices in the Kenton County Courthouse and Administration Building on Good Friday in 1997 and the future violates the Establishment Clause of the First Amendment; and (2) whether the sign announcing the closing in 1996 violated the same provision.

The defendants[1] admitted that the sign—which pictured a crucifix and announced that the building would be closed in observance of Good Friday—violated the First Amendment. By order dated February 14, 1997, the court granted the plaintiffs' motion for summary judgment as to the sign. Thus, the

---

1. The County Judge–Executive and various state and county officials with offices in the courthouse.

only issue remaining before the court is whether the closing this year and in future years violates the First Amendment. Having confirmed by telephone conference that the parties wish to have this matter decided on the record now before the court, the court concludes that the Good Friday closing under the procedures that have now been adopted by the defendants does not violate the First Amendment.[2] Accordingly, summary judgment must be granted in favor of the defendants on that issue.

## BACKGROUND

The facts in this case are undisputed. The Kenton Circuit Court, the Kenton District Court and the Kenton County Fiscal Court are located in the Kenton County Courthouse and Administration Building in Kenton County, Kentucky. Several other state and county offices are also located in that building.

In November of 1995, the appropriate officials entered orders or resolutions identifying the dates on which their respective courts would be closed in 1996. Consistent with the long-standing practice of those courts, the closing schedules were identical. Good Friday, April 5, 1996, was among the seventeen days listed on which the courts would be closed. The other holidays listed were: New Year's Day (two days); Martin Luther King, Jr. day; President's Day; Memorial Day; Independence Day; Labor Day; Columbus Day; Election Day; Veterans Day; Thanksgiving Day (two days); Christmas Day (two days); and New Year's Eve (two days).

In early April of 1996, the Kenton County Deputy Judge Executive, desiring to put his new computer and a clip art database to use, created a colorful sign to be posted on the doors of the building that stated:

KENTON COUNTY OFFICES
WILL BE CLOSED
FOR OBSERVANCE OF GOOD FRIDAY
FRIDAY
APRIL 5th

In addition to the words, the sign contained a picture of a four inch high crucifix with an image of Christ on it.

On April 3, 1996, the plaintiffs initiated this action. They alleged that both the sign posted and the actual closing violated the Establishment Clause of the First Amendment to the Constitution of the United States. Upon receiving notice of the action, the defendants immediately removed the sign and replaced it with a sign that simply stated that the offices would be closed on April 5, 1996.[3]

On April 5, 1996, the building was opened, but the courts and several other offices in the building were closed.

It is undisputed that the courts and the offices in the Kenton County Courthouse and Administration Building have closed on Good Friday for as many years as any witness in this case can remember. Although there is evidence that the offices and courts closed for a half day some years and for a full day other years, it is undisputed that the county and state employees in the building have

2. In their amended complaint, the plaintiffs allege that the closing violates 42 U.S.C. § 1985(3). Section 1985(3) prohibits, in part, conspiring to deprive a person or class of persons of equal protection under the laws. However, in the telephone conference, plaintiffs' counsel indicated that he did not wish to pursue the § 1985 claim. Also, as the closing does not violate the law, there can be no conspiracy claim.

In addition, the defendants challenged plaintiffs' standing to bring this action. However, repeatedly being confronted by state action that offends one's religious beliefs is sufficient to meet the necessary standing requirements. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *see*

*also Hawley v. City of Cleveland*, 773 F.2d 736 (6th Cir.1985), *cert. denied*, 475 U.S. 1047, 106 S.Ct. 1266, 89 L.Ed.2d 575 (1986). In this case, it appears from the complaint that the plaintiffs regularly conducted business at the Kenton County Courthouse. Therefore, their repeated exposure to the signs posted and their inability to conduct business on Good Friday are sufficient to allege standing in this case.

3. Plaintiffs' motion for preliminary injunction was denied at a hearing on Thursday, April 4, 1996, on the ground that the objectionable sign had been removed and laches outbalanced any need for immediate preliminary relief. The court also noted the conflict in the circuits discussed below. There was no appeal.

enjoyed a day or half-day off the Friday before Easter for many years.

After this action was filed, the defendants affirmatively changed the identification of the Good Friday holiday to "Spring Holiday." Barring court intervention, this spring holiday will continue to be observed on the Friday before Easter.

Although the closing is to be observed on Good Friday, the day on which Christians remember Jesus' crucifixion, there is no evidence that the court and office closings are otherwise related to the Christian holiday. No employees are encouraged to attend church or other religious services. No emphasis is placed on the religious aspects of Good Friday.

In support of their contention that Good Friday is the day on which many Kentuckians traditionally begin their spring vacations, the defendants have offered evidence from the Kentucky Transportation Cabinet indicating that, in 1995, highway traffic on Good Friday was third in volume only to Independence Day and the Thanksgiving weekend. Plaintiffs have made no effort to contest that evidence.

## ANALYSIS

### The Law Before *Pinette*

The First Amendment to the Constitution of the United States addresses the subject of freedom of religion succinctly, stating:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.[4]

Exactly what the framers intended by this language has been the subject of considerable debate. In trying to apply the concise language of this clause in our diverse society, the courts, including this court, have been anything but concise. *See American Civil Liberties Union v. Wilkinson,* 701 F.Supp. 1296 (E.D.Ky.1988), *aff'd,* 895 F.2d 1098 (6th Cir.1990).

As early as 1989, this court identified seven theories being advocated by various courts, judges and scholars for the interpretation of the Establishment Clause. In descending order of separatism, these theories were:

1. Secular tools must be used unless only religious means will suffice to pursue a relevant free exercise value;

2. The key question is: whether a non-adherent would feel coerced by a religious action, with all doubts to be resolved in favor of protecting the sensibilities of the non-adherent;

3. Symbols of "civil religion" would be accepted, such as legislative prayer, but all else would be invalid;

4. The "endorsement test" hereinafter discussed;

5. Emphasis on equal access, i.e. no religious symbols on public property, because non-believers would not accept them;

6. There will be no violation of the Establishment Clause absent government coercion to practice a religion; and

7. Only where government had an "institutional arrangement" with religion would an action be invalid.

*American Civil Liberties Union v. Wilkinson,* 701 F.Supp. 1296, 1308–09 (E.D.Ky. 1988), *aff'd,* 895 F.2d 1098 (6th Cir.1990).[5]

In *Wilkinson,* this court held that the Sixth Circuit had adopted the "endorsement test" and concluded that it was to be preferred over the competing tests. *Wilkinson,* 701 F.Supp. at 1309–10; *see also American Civil Liberties Union v. City of Birmingham,* 791 F.2d 1561 (6th Cir.), *cert. denied,* 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986).

In the instant opinion, the court is assisted by the fact that—after some intervening dis-

---

4. This amendment, although originally applicable only to Congress, is made applicable to the states by the Fourteenth Amendment. *See, e.g., Capitol Square Review and Advisory Bd. v. Pinette,* —— U.S. ——, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995).

5. Several articles discussing the conflicting nature of Establishment Clause law at that time were discussed in *Wilkinson.*

agreement[6]—the Supreme Court seems to have reached a consensus on the correct approach to the Establishment Clause. In the Supreme Court's latest Establishment Clause opinion, *Capitol Square Review and Advisory Board v. Pinette,* —— U.S. ——, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995), this court's view in *Wilkinson* was essentially adopted by a majority of the Court.

### Pinette Analyzed

In *Pinette,* the State of Ohio denied the Ku Klux Klan's application for a permit to erect an unadorned cross on Capitol Square in Columbus, Ohio, during the Christmas holiday season. The permit authority did not rely on the history of the Klan's using the cross, especially a burning cross, as an instrument of hate, prejudice and oppression. Instead, it based its denial of the permit on the religious significance of the cross as a Christian symbol. *Pinette,* —— U.S. at ——–——, 115 S.Ct. at 2444–45.

It was undisputed that Capitol Square was a traditional public forum. *Id.* When the Klan challenged the permit denial, the state defended on the ground that permitting the cross would violate the Establishment Clause. *Pinette,* —— U.S. at ——, 115 S.Ct. at 2445. The district court and the United States Court of Appeals for the Sixth Circuit held that the permit had been wrongfully denied and concluded that the presence of the cross in the Square would not violate the Establishment Clause. *See Pinette v. Capitol Square Review and Advisory Bd.,* 30 F.3d 675 (6th Cir.1994) and *Pinette v. Capitol Square Review and Advisory Bd.,* 844 F.Supp. 1182 (S.D.Ohio 1993).

The Supreme Court did not advert to the political history of the Klan but treated the case as presenting the pure Establishment Clause issue of whether a private organization could be permitted to erect a Christian religious symbol in an area which was a traditional public forum located adjacent to the seat of state government. *Pinette,* —— U.S. at ——–——, 115 S.Ct. at 2445–47.

Importantly, the Court[7] approached the case as a free speech case. It addressed the Establishment Clause, however, because the state argued that permitting the cross, albeit in a public forum, would violate the Establishment Clause. The plurality noted that "compliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech." *Pinette,* —— U.S. at ——, 115 S.Ct. at 2446.

In part IV of his opinion, Justice Scalia spoke only for a plurality.[8] The plurality was of the view that, strictly speaking, the "endorsement test" should be used only in cases involving "expression *by the government itself* ... or else government action alleged to *discriminate in favor* of private religious expression or activity." *Pinette,* —— U.S. at ——, 115 S.Ct. at at 2447 (emphasis in original).

In the view of the plurality, it was not even necessary to apply the endorsement test to cases involving private religious expression in a public forum. Rather:

> Religious expression cannot violate the Establishment Clause where it (1) is purely private and (2) occurs in a traditional or designated public forum, publicly announced and open to all on equal terms.

*Pinette,* —— U.S. at ——, 115 S.Ct. at 2450.

In separate concurring opinions, Justices O'Connor, Souter and Breyer expressed the view that the endorsement test should apply to both government speech and private speech on government property. *Pinette,* —— U.S. at ——, 115 S.Ct. at 2452. Justice O'Connor also clarified the criteria for application of the endorsement test through the "perception of a reasonable, informed observer." *Id.*

In her view, "when the reasonable observer would view a government practice as endorsing religion ... it is our *duty* to hold the practice invalid." *Pinette,* —— U.S. at ——,

---

**6.** *See County of Allegheny v. American Civil Liberties Union,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989).

**7.** In this portion of his opinion, Justice Scalia wrote for the Court.

**8.** The plurality included Chief Justice Rehnquist and Justices Scalia, Thomas and Kennedy.

115 S.Ct. at 2454 (emphasis in original). In addition, an inquiry by this reasonable observer must be "judged in its unique circumstances" and "subjected to careful judicial scrutiny." *Id.*

The "reasonable observer" through whose eyes a court must scrutinize the government action is akin to the ordinarily prudent person of tort law. This observer "is presumed to possess a certain level of information that all citizens might not share." *Id.* The observer "must be deemed aware of the history and context of the community and forum" in which the religious action occurs.[9]

*Id.*

> The reasonable observer would recognize the distinction between speech the government supports and speech that it merely allows in a place that traditionally has been open to a range of private speakers accompanied, if necessary, by an appropriate disclaimer.

*Id.* at ——, 115 S.Ct. at 2456.

Justice O'Connor and seven other Justices seem to agree with the views expressed by this court in *Wilkinson,* 701 F.Supp. at 1301, that an appropriate disclaimer can, in many situations, rebut an inference of government endorsement that might otherwise arise.

Since the Klan in *Pinette* was willing to use a disclaimer, Justice O'Connor held that application of the endorsement test resulted in the conclusion that the state would not violate the Establishment Clause in permitting the cross. *Pinette,* —— U.S. at ——, 115 S.Ct. at 2457.

Justice Ginsburg dissented in an opinion that implicitly accepts the endorsement test, but finds the display under consideration unconstitutional under that test. She particularly emphasized the lack of a disclaimer. She expressly approved the disclaimer ordered by this court in *Wilkinson* and implied

that the display in the case before the Court would have been constitutional had a similar disclaimer been employed. *Pinette,* —— U.S. at —— n. 1, 115 S.Ct. at 2474 n. 1.

In summary, then, synthesizing the various opinions, eight members of the *Pinette* Court have adopted the endorsement test [10] in cases which, like the instant case, involve government expression (as opposed to private religious speech in a government supplied forum). In private speech cases, at least five members of the Court would apply the endorsement test and three would approve such displays per se.[11] A majority of Justices seem to have implicitly abandoned the tripartite test of *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). *See* Kent Greenwalt, *Quo Vadis: The Status and Prospects of "Tests" Under the Religion Clauses,* 1995 Supreme Court Review 323.[12]

### Application of the Endorsement Test to the Case at Bar

#### *The Posted Sign*

■ Applying the endorsement test, as elaborated in the various opinions in *Pinette,* it is readily apparent that the sign posted in this case violated the Establishment Clause. The sign depicted the crucifixion of Christ and stated that the Kenton County Offices, including the courts, would be closed "in observance of Good Friday."

In this case of government speech (rather than private speech in a public forum), the sign could be, and was in fact, perceived by reasonably informed observers, to be a government endorsement of the Christian religion. The court accepts that this apparent endorsement was not intended, but this made no difference in the observer's perception. Although the defendants immediately abjured use of the sign, removed it, and disa-

---

9. Justice O'Connor implies that all members of the Court who advocate the endorsement test agree on these characteristics of the observer. *Pinette,* —— U.S. at ——, 115 S.Ct. at 2455.

10. The majority also employed the endorsement test in *Rosenberger v. Rector & Visitors of Univ. of Va.,* —— U.S. ——, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (the dissenters did not reject the test, but thought the particular government action at issue was per se invalid as a funding of religion).

11. Justice Stevens would apply a much more stringent endorsement test employing the viewpoint of anyone who *could* perceive an endorsement from a government action. *Pinette,* —— U.S. at ——, 115 S.Ct. at 2464–73.

12. The author of this article believes that all Justices would employ the endorsement test in cases of government speech. *Id.* at 370.

vow any intent to use it in the future, its use will be enjoined.

### Closing the Courthouse on Good Friday

■ Turning now to the principal issue before it, this court must apply the endorsement test now mandated by a clear majority of the Justices of the Supreme Court. This requires this court to place itself in the figurative shoes of a "reasonable observer" as defined in the opinions of Justice O'Connor and adopted by a majority of the Supreme Court. *Pinette,* —— U.S. at ——, 115 S.Ct. at 2455.

This observer "must be deemed aware of the history and context of the community and forum in which the religious display appears." *Id.* Further, the knowledge of this hypothetical observer is not to "be limited to the information gleaned simply from viewing the challenged display." *Id.*

In the *Pinette* case, for example, the Court attributed to the hypothetical observer "knowledge that the cross is a religious symbol, that Capitol Square is owned by the State, and that the large building nearby is the seat of state government." *Id.* In Justice O'Connor's view the observer should also be deemed to "know the general history of the place" where the display occurs. *Id.* at —— —— ——, 115 S.Ct. at 2455–56. This is not to say the observer must be presumed to be an " 'ultra-reasonable observer' who understands the vagaries of [the Supreme Court's] First Amendment jurisprudence." [13] *Id.* at ——, 115 S.Ct. at 2456. Rather, the observer is considered to be "[a]n informed member of the community" who "will know how the public space in question has been used in the past." *Id.*

The observer must not be deemed to be super-sensitive.[14] "Thus, we do not ask whether there is *any* person who *could* find an endorsement of religion, whether *some* people may be offended by the display, or

whether *some* reasonable person might think [the government] endorses religion." *Id.* at ——, 115 S.Ct. at 2455 (emphasis added and in original).

The key to Justice O'Connor's approach to these Establishment Clause problems is the necessity of preventing non-adherents from feeling excluded from the community or believing that their standing in it is impaired by the perceived government endorsement of religion. *Pinette,* —— U.S. at ——, 115 S.Ct. at 2452. It is significant, therefore, that she states, "A State has not made religion relevant to standing in the political community simply because a particular viewer of a display might feel uncomfortable." *Id.* at ——, 115 S.Ct. at 2455.

Applying these criteria to the informed observer from whose perspective the instant case must be decided, that observer must be deemed to be aware of the following facts: For many years, the Kenton County Courthouse has closed on Good Friday. The orders and resolutions of the various courts and county and state officers made specific reference to Good Friday. The courthouse usually closed for the entire day, although by law only half a day was a state holiday.

Many local public schools and businesses also close on all or part of Good Friday. In addition, at least one major national institution—the New York Stock Exchange—closes on that day. In many Northern Kentucky communities this is the traditional start of spring vacation. This area is usually experiencing chilly weather in March and early April, and, as reflected by the Kentucky Transportation Cabinet Statistics, many Kentuckians spend Good Friday traveling to warmer areas.

The observer would also be aware that there is an abundance of local church services in this area on Good Friday. Many churches offer services in the early morning,

---

**13.** This is fortunate in that it would be difficult to find even a law professor or federal judge with such expertise.

**14.** *Kunselman v. Western Reserve Local Sch. Dist.,* 70 F.3d 931, 932–33 (6th Cir.1995) (fact that plaintiffs were offended by use of a "Blue Devil" as symbol of a high school athletic team did not mean that symbol violated Establishment Clause,

where no reasonable observer could believe symbol was an endorsement of Satanism); *Gaylor v. United States,* 74 F.3d 214, 217 (10th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 1830, 134 L.Ed.2d 934 (1996) (observer deemed aware of traditional use of motto "In God We Trust" by government).

during the lunch hour, and after working hours. Thus, it is not necessary for the courthouse employees to be off work to attend services.

Under the Supreme Court criteria, the observer would also be aware of the history of this controversy. He or she would know that as soon as objections to the sign surfaced in 1996, the courthouse authorities removed the sign. The ·observer would also know that the official posting the sign immediately disclaimed any intent to endorse religion.[15]

The observer is presumed to know that some officials stated that they closed because it was traditional; others that they closed because there would be problems getting services such as heat and maintenance. Others stated that few members of the public could be expected to come in on that day. The courts in particular believed it would be difficult to get jurors and witnesses. Some stated that they merely desired to accommodate their employees on that busy weekend. The employees might desire to travel for a spring vacation or to family gatherings which are traditional for the Easter holiday, for both the religious and non-religious.

The informed observer would know that the officials reformed their practices with regard to this holiday to make every possible effort, while still closing on the Friday before Easter, to rebut any impression that they were closing *in observance* of the holiday. The resolutions and orders have all been amended to merely state that the courthouse will close this year on a given date. The signs will also so state. In short, the officials have done almost everything they can to disclaim any intent to endorse religion.[16] This court concludes that, from the perspective of the observer[17] informed of all these facts, the courthouse closing does not appear to endorse the Christian religion.

## The Remains of the *Lemon* Test

■ It seems probable that the Supreme Court has abandoned the tri-partite test of *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).[18] Nevertheless, this court will briefly address the application of those factors, since the plaintiffs have argued them, and recent appellate opinions[19] have adverted to them. Under the *Lemon* test:

> Government action will not contravene the Establishment Clause if: 1) it has a secular purpose; 2) its principal or primary effect neither advances nor inhibits religion; and 3) it does not foster an excessive government entanglement with religion. The secular purpose test is an inquiry into whether the government's actual purpose is to endorse or disapprove of religion.

*Hartmann v. Stone,* 68 F.3d 973, 979 (6th Cir.1995) (citing *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) and *Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985)).

First, the courthouse closing in 1997 and future years has a secular purpose, to provide a spring holiday at a festive time of the year. Almost all cultures have some kind of spring festival. The plaintiffs in this case

---

**15.** Rather, he states he was merely experimenting with the clip art database on his new computer. He provides for the record posters announcing closings on Thanksgiving, Fourth of July, and Christmas, with pilgrims, turkeys, pumpkins, holly, firecrackers or other symbols appropriate to the particular holiday. Apparently, the clip art database is extensive.

**16.** It may be the defendants would be willing to add a written disclaimer to the new sign, but the court will not order it since it does not appear necessary to avoid the appearance of endorsement.

**17.** The court must place itself in the position of the observer, but need not use polling data or similar materials, because the inquiry is an "ob-

jective inquiry that this court is fully equipped to conduct with the facts at hand." *Gaylor,* 74 F.3d at 217.

**18.** *Quo Vadis,* 1995 Supreme Court Review at 359–60.

**19.** In *Kunselman v. Western Reserve Local School District,* 70 F.3d 931, 932 (6th Cir.1995), the court employed the endorsement test as the touchstone of the *Lemon* "effects" prong. *See also Hartmann v. Stone,* 68 F.3d 973, 979 (6th Cir.1995) (court mentions *Lemon* but relies on *Pinette*); *Gaylor v. United States,* 74 F.3d 214 (10th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 1830, 134 L.Ed.2d 934 (1996) (states *Lemon* "is still good law," but applies both *Lemon* and endorsement tests without merging them).

adduced no evidence to show that the stated neutral reason for the Good Friday closing is a pretext.

Second, there is no evidence that the closing has the primary effect of promoting or inhibiting religion. A person can go to church, read scriptures or meditate outside working hours, and a person who is off work can travel, do housework, begin preparing a holiday dinner or engage in other purely secular activities. There is no evidence that even one person pursued religious activities because the courthouse was closed, who would not have done exactly the same thing otherwise.

Finally, with regard to the third *Lemon* criterion, there is not a whit of entanglement between the defendant officials and any church or religion. It is true that the closing may have the incidental effect of accommodating someone in a religious activity. But this has long been permitted [20] and is in complete harmony with the First Amendment because, besides the Establishment Clause, that amendment also prohibits government from prohibiting "the free exercise" of religion.[21]

In short, the decision when to close the county courthouse remains in the discretion of the state officials with whom the constitutional separation of powers has wisely left it. As I have expressed on many occasions, I strongly believe that the federal courts should avoid—whenever possible—getting involved in decisions of this kind which the Tenth Amendment [22] has reserved to local and state government. The rhetoric of a "wall of separation" between church and state has been repudiated by the Supreme Court,[23] but even if there were such a wall, it would not be breached by closing the court-

house on the occasion of a traditional spring holiday.

### Other Good Friday Closing Cases

Only two of the federal courts of appeals have addressed the issue of closing on Good Friday. The earliest decision, *Cammack v. Waihee*, 932 F.2d 765 (9th Cir.1988), *cert. denied*, 505 U.S. 1219, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992), applied the *Lemon* test and found that a Hawaii statute declaring Good Friday a state holiday did not violate the Establishment Clause because of the secular purpose of providing an additional holiday for the people of the state.

Plaintiffs here rely heavily on the second federal appellate decision, *Metzl v. Leininger*, 57 F.3d 618 (7th Cir.1995). Unfortunately,, this case was decided a few days before the Supreme Court's decision in *Pinette,* and the *Metzl* court did not have the benefit of the high court's decision, as hereinabove outlined.

The Seventh Circuit was apparently applying the *Lemon* test, although that is not completely clear. In any event, its decision that a state statute declaring a public school holiday on Good Friday was very fact specific and largely based on what it deemed to be inadequacies in the factual record regarding secular versus religious practices on the Friday before Easter.

Importantly, the court demonstrated some discomfort with its holding and confined it to inadequacies in the record. Thus, in the course of its opinion, the court stated:

> ... Illinois might have argued that the contemporary purpose of the Good Friday public school closing law is to provide a long spring weekend, Good Friday being chosen rather than a different Friday in the spring, or a Monday, because many

---

**20.** *See, e.g., Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984); *Zorach v. Clauson,* 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952).

**21.** The court does not believe that the Free Exercise Clause is applicable here, or that the defendants would have to demonstrate a compelling state interest to remain open, because the court finds as a fact that any effect the closing has on religion is minimal.

**22.** The Tenth Amendment to the Constitution of the United States reads:
   The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

**23.** *Lynch v. Donnelly,* 465 U.S. 668, 673, 104 S.Ct. 1355, 1359, 79 L.Ed.2d 604 (1984); *Committee for Pub. Educ. and Religious Liberty v. Nyquist,* 413 U.S. 756, 770, 93 S.Ct. 2955, 2964, 37 L.Ed.2d 948 (1973).

**750**

students and teachers would stay away from school anyway on Good Friday, even if school were open. Such an argument would take nourishment from the cases like *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), which uphold Sunday closing laws.... *Had Illinois made a forthright official announcement that the public schools shall be closed on the Friday before Easter in order to give students and teachers a three-day spring weekend, rather than to commemorate the crucifixion of Jesus Christ, we might have a different case.*

*Metzl*, 57 F.3d at 622–23 (emphasis added).

Of course, the defendants in the instant case do argue that the purpose of their spring holiday on the Friday before Easter is to give employees a spring break, rather than to commemorate the crucifixion of Jesus Christ. This court agrees with the Seventh Circuit that this does make it a "different case."

In emphasis of this point, the Seventh Circuit further observed that Illinois could validly accomplish the secular purpose of a Good Friday closing "either by officially adopting a 'spring weekend' rationale for the law ... or by moving to a system of local option for school districts." *Id.* at 624.

Therefore, a close analysis of *Metzl* demonstrates that the instant plaintiffs' reliance on it is misplaced. Indeed, *Metzl* supports the defendants' position because they have adopted the procedures that the Seventh Circuit opinion suggests. Clearly, the Seventh Circuit was deliberately laying down guidelines on how to establish the closing of public facilities on the Friday before Easter, or any other day that happens to have religious significance in the community.

Therefore, *Cammack, Metzl,* and the decision of this court are harmonious. The Establishment Clause is not violated by the instant defendants' closing of the Kenton County Courthouse on the Friday before Easter under the circumstances described in this record.

**CONCLUSION**

The court has previously granted the motion of the plaintiffs for summary judgment regarding the sign posted in 1996. An injunction will enter prohibiting repetition of such practices.

A judgment will also enter concurrently herewith denying relief as to closing the courthouse on Good Friday in 1997 or future years if the practices now in effect continue to be observed. Therefore, the court being advised,

**IT IS HEREBY ORDERED** that plaintiffs' motion for summary judgment is denied as to closing the Kenton County Courthouse. The defendants' motions for summary judgment are granted on that issue.

***JUDGMENT***

Pursuant to the Opinion and Order entered concurrently herewith, the court being advised,

**IT IS ORDERED, ADJUDGED, AND DECLARED** as follows:

1. That a separate Injunction shall enter pursuant to said Opinion and Order;

2. That the defendants may continue to close on the Friday before Easter in 1997 and future years if current practices are pursued and the Injunction is obeyed; and

3. That plaintiffs shall recover their costs, including appropriate attorney's fees. 28 U.S.C. Section 1988.

***INJUNCTION***

Pursuant to the Opinion and Order and Judgment entered concurrently herewith, the court being advised,

**IT IS ORDERED AND ADJUDGED** that the defendants and all persons in active court and participation with them be and they are hereby restrained and enjoined from posting any sign in connection with closing of the Kenton County Courthouse on the Friday before Easter, which depicts the Crucifixion of Jesus Christ or states that the closing of

the courthouse on that day is in observance of Good Friday.