**Edwin F. KAGIN, et al., Plaintiffs,**

v.

**Leonard L. KOPOWSKI,
et al., Defendants.**

**No. Civ.A. 96–195.**

United States District Court,
E.D. Kentucky.

Aug. 4, 1998.

---

David A. Friedman, American Civil Liberties Union, Louisville, KY, Marc D. Stern, American Jewish Congress, New York City, for Plaintiff.

Morgan G. Ransdell, Office of Attorney General, Frankfort, KY, for Defendant.

## OPINION

BERTELSMAN, Chief Judge.

The court is once again called upon to interpret in the context of local government the Establishment Clause of the religion clause of the First Amendment to the Constitution of the United States.

The last occasion this court had to do this was a challenge to the closing of a county courthouse on Good Friday. *See Granzeier v. Middleton*, 955 F.Supp. 741 (E.D.Ky.1997). At the time that opinion was written it appeared that the endorsement test had become the lodestone of Establishment Clause analysis and the venerable *Lemon* test was all but defunct.

As with Mark Twain and Bob Hope, however, reports of the death of *Lemon* proved to be highly exaggerated. Inasmuch as the court attempted briefly to recount the history of the Establishment Clause interpretation in *Granzeier*, this opinion will take up where *Granzeier* left off.

## FACTS

The Campbell Circuit Court is the court of general jurisdiction for Campbell County, Kentucky. As such, that court has jurisdiction over domestic relations cases. The defendants, Honorable Leonard L. Kopowski and Honorable William J. Wehr are the only two judges of that court. They are sued here in their official capacities only. The plaintiffs here seek only injunctive and declaratory relief and attorney's fees.

In 1993, the defendants entered a General Order. On November 20, 1997, the Kentucky Supreme Court approved certain amendments to this General Order. As amended, the General Order provides in its entirety:

IT IS HEREBY ORDERED that all parents with minor children who are parties to a dissolution (divorce) or legal separation in Campbell and Kenton Counties shall attend a two-hour divorce education seminar acceptable to the Court within 45 days of the filing of this action. The purpose of the seminar is to educate and sensitize parents to their own needs and the needs of their child(ren) during and after the divorce. It is hoped that this parental education will increase parents' abilities to cope with the stress of divorce, to constructively resolve problems related to their child(ren) and the breakup of the marriage, and to facilitate adjustment of the divorce for the child(ren).

The attorney representing the petitioner shall notify his or her client of this obligation and shall attached [sic] a copy of the brochure "Parents are For Good" to the summons and petition in order that the respondent receives notification of this obligation. The brochures entitled "Parents are For Good" are located in the Circuit Clerk's Office and will explain how to preregister. A similar program with the same goals and objectives may be utilized by the parties, either by agreement or court Order.

This Order applies only to those couples with a child or children of the marriage. A couple may request exemption from this Order by submitting separation agreement which fully resolves custody, visitation and

child support in conjunction with an Agreed Order to waive the divorce education seminar for the reason that all issues surrounding the child(ren) have been amicably resolved. Other requests for exemption shall be granted upon a showing of compelling reason.

The "Parents are For Good" program is put on by Catholic Social Services (through its Family Conciliation Program). Each participant must pay a $15.00 registration fee to Catholic Social Services. However, according to the defendants, the $15.00 fee is not even sufficient to cover the entire cost of the "Parents are For Good" program, and none of the fee paid for that program goes to any religious purpose.

In August 1996, Elizabeth Oldiges filed for a divorce. Plaintiff Edwin Kagin represented her in that action in Campbell Circuit Court. As Oldiges and her estranged husband had not resolved all child custody issues, she was subject to the General Order requiring her to receive parental counseling.[1] Immediately after this action was filed, Judge Wehr excused her from attending the "Parents are For Good" program and required her "to attend a two hour divorce education seminar within 45 days of filing the action, an alternative being 'Helping Children Cope With Divorce' sponsored by the Aring Institute." Ms. Oldiges' divorce proceeding was ultimately resolved by agreement on October 31, 1997.

As indicated by the record, Catholic Social Services is an agency of the Roman Catholic Diocese of Covington. Its director is appointed by the Bishop of Covington, who has a veto power over all of its decisions. This agency is incorporated under the laws of the Commonwealth of Kentucky. Its articles of incorporation provide that, in the event of its dissolution, all of its assets will vest in the Bishop of Covington.

The program described above is presented by laypeople, who may or may not be Catholic. Having carefully scrutinized the program, both in concept and actual presentation, the court finds no evidence of any presentation of Catholic doctrine, nor any

efforts at conversion. Plaintiffs do not disagree with these findings.

The following is an outline of the program, taken from the "Parents are For Good" brochure:

## TABLE OF CONTENTS

Divorce Statistics

**The Divorce Experience For Adults**

The Emotions of Divorce

The Cycle of Grief

Stages of the Divorce Process

Psychological Tasks of Divorce for Adults

**The Divorce Experience for Children**

How Children Typically Respond to Divorce

Infants

Toddlers

Pre–School Age

Young School Age

Older School Age

Adolescents

Psychological Tasks of Divorce for Children

**What Parents Can Do**

Telling the Children About the Divorce

What Children Need to Hear

Telling Others About the Divorce

What to Do After Telling the Children

Harmful Games

Children's Bill of Rights

**Children At Risk**

When to seek professional help

**Divorce Mediation**

**Community Resources**

**Reading Resources**

(Page numbering omitted).

Plaintiffs admit that the program is beneficial for divorcing couples and their children in that it promotes the mental health of the parents and children. It also promotes the interests of the state by promoting family harmony and minimizing litigation.

---

1. At the time of Ms. Oldiges' divorce, the General Order had not yet been amended to state that any acceptable parental counseling program would suffice. At that time, the General Order referenced only the "Parents are For Good" program.

Neither do plaintiffs object to Catholic Social Services being a presenter of the program. As stated in one of their memoranda, the plaintiffs challenge the "facially neutral general order ... requiring affected divorce litigants to pay for and attend the Catholic Social Services' seminar, *and it alone,* or to persuade a judge that good cause warranted an exemption from that requirement ." Plaintiffs' memorandum filed Jan 5, 1998 p. 2.

Plaintiffs argue further:

Even if the seminar content is completely secular, the judges have given favored status to the Catholic Church sponsor of that program. It is not CSS' mere participation that renders the general order unconstitutional—to the contrary, *Bowen v. Kendrick,* 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988), probably permits it to participate on an equal footing with non-sectarian organizations—but CSS' exalted status. Even if the CSS program message is secular, the audience cannot miss that judges—the very governmental officials who enforce the law and dispense justice—have conferred special status on the Catholic Church as the messenger. This affects both the weight the audience may give to the message and the import it draws from judicial favoritism to the Catholic Church. (footnotes omitted).

Doc. # 54, at p. 4.

Plaintiffs contend the order violates both the endorsement and *Lemon* tests.

### The *Lemon* Test

A little more than a year ago, the Supreme Court held that the *Lemon* test was still valid but had been substantially modified. *See Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997).

The facts in *Agostini* were not directly in point with the facts here in that *Agostini* involved a state employee providing Title I services on the premises of sectarian schools. However, the Court cited with approval *Bowen v. Kendrick,* 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988), which is more in point with the facts of the instant case.[2] *See Agostini,* 117 S.Ct. at 2001, 2005 (citing *Bowen,* 487 U.S. at 602–04, 615–17, 108 S.Ct. at 2570–72, 2577–79).

The classic *Lemon* test provided that to pass scrutiny under the Establishment Clause:

First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion.

*Agostini,* 521 U.S. at ——, 117 S.Ct. at 2008 (quoting *Sch. Dist. of Grand Rapids v. Ball,* 473 U.S. 373, 382–83, 105 S.Ct. 3216, 3222, 87 L.Ed.2d 267 (1985) (citations omitted)).

In *Agostini,* the Court revised the *Lemon* analysis by combining the "entanglement" prong of the test with the "effects" prong.[3] The factors to be considered in applying "effects/entanglement" scrutiny are the "character and purpose of the institutions benefited (*e.g.,* whether the religious institutions were predominantly religious)" and whether the aid provided is neutral and non-ideological.[4]

In applying these criteria, the Court repeatedly stressed that it is improper to assume that a provider of services, such as a teacher, will ignore instructions to the contrary and engage in subtle indoctrination of religion just because there is some connection between the services and religion.[5]

Further, the trial court must not conclude that there is religious indoctrination without evidence.[6] Nor is the necessity of some monitoring by the secular authority or administrative cooperation between the secular and religious entities sufficient to violate the "effects/entanglement" criterion.[7]

After careful consideration of these criteria, this court must conclude that the order of the Campbell Circuit Court under review does not violate the Establishment Clause.

---

2. *Bowen* involved grants to religious and other organizations to provide counseling on teenage sexuality.

3. 521 U.S. at ——, 117 S.Ct. at 2015.

4. Id. (citations omitted).

5. Id. at 2012.

6. Id.

7. Id. at 2015.

Plaintiffs admit that there is a secular purpose for the program—promotion of the mental health and well being of divorcing parents and their children and the reduction of unnecessary litigation in connection with divorces involving children. Indeed, plaintiffs admit the program is beneficial. Thus, the first prong of the revised *Lemon* test is satisfied.

Nor have the plaintiffs established that the primary effect of the program is to advance religion, or, indeed, that it advances religion at all. As pointed out above, this court may not presume that any indoctrination occurs merely because there is a possibility thereof. Evidence is required. Such evidence is entirely lacking in this case. The program as presented has no religious content, except to the extent that good mental health is religious.

The monitoring and administrative cooperation required by the program are minimal at best, and even if they were somewhat greater would be insufficient to invalidate the program. Far greater "entanglement" existed in *Agostini.*

The defendants' program probably survives the classical *Lemon* analysis and certainly survives the analysis mandated by *Agostini.*[8]

This conclusion is buttressed by a review of *Bowen v. Kendrick,* 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988), which was reaffirmed by the Court in *Agostini. Bowen* involved the provision of government grants to religious institutions for the funding of programs to discourage adolescent pregnancies. *See Bowen,* 487 U.S. at 634, 108 S.Ct. at 2588. Almost all of the contentions made by the plaintiffs here were rejected there. Most pertinently the Court recognized "the long history of cooperation and interdependency between governments and charitable or religious organizations" and noted that "[c]haritable organizations with religious af-

filiations historically have provided social services ... without controversy." *See id.* at 609, 108 S.Ct. at 2574 (citations omitted). The Court clearly held that such practices did not constitute an establishment of religion unless the aided institutions were "pervasively sectarian."[9] The Court made these observations after citing with approval a case wherein a local government paid for an addition to a religious hospital out of public funds.[10]

*Bowen* also teaches another important principle: that the mere provision of some funding or the existence of some cooperation does not constitute a prohibited "symbolic link" between the public and religious entities. The Court said:

As yet another reason for invalidating parts of the AFLA, the District Court found that the involvement of religious organizations in the Act has the impermissible effect of creating a "crucial symbolic link" between government and religion. If we were to adopt the District Court's reasoning, it could be argued that any time a government aid program provides funding to religious organizations in an area in which the organization also has an interest, an impermissible "symbolic link" could be created, no matter whether the aid was to be used solely for secular purposes. This would jeopardize government aid to religiously affiliated hospitals, for example, on the ground that patients would perceive a "symbolic link" between the hospital—part of whose "religious mission" might be to save lives—and whatever government entity is subsidizing the purely secular medical services provided to the patient. We decline to adopt the District Court's reasoning and conclude that, in this litigation, whatever "symbolic link" might in fact be created by the AFLA's disbursement of funds to religious institutions is not suffi-

---

8. *See* Id. at 2008–17; *accord Peck v. Lansing Sch. Dist.,* 148 F.3d 619, 627–29 (6th Cir.1998).

9. The program under review is not "pervasively sectarian." It is presented by laypeople in neutral settings. As stated, there is no evidence of indoctrination.

10. *See* id., 108 S.Ct. at 2574 (citing *Bradfield v. Roberts,* 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168 (1899). It is true that in the instant case the litigants are paying the fee to the agency providing the services, but the fee is a nominal one and no one questions that the services are more than worth the amount charged. The religious hospital mentioned in the text above undoubtedly also charged fees.

cient to justify striking down the statute on its face.

*Bowen,* 487 U.S. at 613–14, 108 S.Ct. at 2576–77 (citations omitted).

### The Endorsement Test

Plaintiffs argue that the fact that litigants must take some action to use an alternative provider for the divorce counseling program constitutes an endorsement of the Catholic religion.

The court disagrees. Litigants who wish may substitute another program with a minimum of effort. True, there is some effort, but it is minimal. The necessity of such effort does not violate the revised *Lemon* criteria. Nor does it constitute an "endorsement" of the Catholic religion in the eyes of a reasonable observer,[11] considering the secular content of the program. This observer would also have knowledge that Catholic Social Services engages in other social work activities, such as investigating adoptions for the Commonwealth.

For the above reasons, the motion for summary judgment of the defendants must be granted.

### *Motion to Remand*

The plaintiffs have moved to remand this action to the state court on the ground that the claims based on the Kentucky State Constitution are barred by the Eleventh Amendment.

At the time the motion was filed, the federal courts of appeals were divided on whether an action could be removed if there were claims barred by the Eleventh Amendment in addition to federal claims.

This issue has been settled by the recent decision of the Supreme Court of the United States in *Wisconsin Dep't of Corrections v. Schacht,* —— U.S. ——, ——, 118 S.Ct. 2047, 2054, 141 L.Ed.2d 364 (1998), wherein the Court held that such an action could be removed, the federal claims decided, and the state claims barred by the Eleventh Amendment remanded, which is what we shall do here.

For the reasons above stated,

**IT IS ORDERED** as follows:

1. That the motion for summary judgment of the plaintiffs with respect to the federal claims must be, and it is, hereby **denied** and that of the defendants is **granted;**

2. That the motion to remand is **granted in part** and **denied in part** as above indicated; and

3. That a separate judgment shall enter concurrently herewith.

### *JUDGMENT*

**IT IS ORDERED AND ADJUDGED** that the complaint in this case is hereby dismissed and stricken from the docket of this court, pursuant to the court's opinion filed concurrently herewith.

### *AMENDED JUDGMENT*

Pursuant to Federal Rules of Civil Procedure 60(a), the Judgment in this matter entered August 4, 1998, is hereby amended to read as follows:

**IT IS ORDERED AND ADJUDGED** that the federal claims contained in the complaint in this case are hereby dismissed and stricken from the docket of this court with prejudice, pursuant to the court's opinion filed concurrently herewith.

**IT IS FURTHER ORDERED AND ADJUDGED** that the state claims contained in the complaint are hereby remanded to the Campbell Circuit Court, whence they were removed.

---

**11.** *See Chaudhuri v. Tennessee,* 130 F.3d 232, 237–38 (6th Cir.1997) *cert. denied* —— U.S. ——, 118 S.Ct. 1308, 140 L.Ed.2d 473 (1998); *Gran-* *zeier v. Middleton,* 955 F.Supp. 741, 747–48 (E.D.Ky.1997).