**Edward R. MYERS, Plaintiff,**

v.

**LOUDOUN COUNTY SCHOOL BOARD, et al., Defendants.**

No. CIV. 02–1528–A.

United States District Court, E.D. Virginia, Alexandria Division.

Feb. 21, 2003.

Edward R. Myers, pro Se.

E. William Chapman, on brief and oral argument, Leesburg, VA, for Defendants.

Kelly A. Sherrill, Reed Smith, on brief, for Defendants.

Alison P. Landry, Asst. Atty. Gen., on brief and oral argument, intervenor for Defendants.

### MEMORANDUM OPINION

CACHERIS, District Judge.

This matter is before the Court on the Commonwealth of Virginia's Motion to Intervene as of Right under 28 U.S.C. § 2403(b) and Defendants' and Intervenor's Motion to Dismiss under Rule 12(b)(6). The Plaintiff challenges the daily recitation of the pledge of allegiance in the public schools and the posting of the national motto "In God We Trust" in public school buildings. For the reasons set forth below the Defendants' and Intervenor's Motions to Dismiss are granted.

## I. Background

Plaintiff Edward Myers, ("Myers"), acting *pro se*, brings suit against the Loudoun County School Board[1] ("the School") and Dr. Edgar B. Hatrick ("Hatrick"), Superintendent of the School.[2] Myers brings the suit on behalf of his two minor children, who are elementary school students enrolled in the School.

The gist of Myers' Complaint is that the School's implementation of two Virginia statutes, designed to foster patriotism and respect for country, is unconstitutional. In particular, Myers challenges (1) the facial validity of the Virginia statute mandating that students enrolled in public school in Virginia recite the pledge of allegiance at least one time every school day (the "pledge statute");[3] (2) the School's implementation of the pledge statute; and (3) the School's implementation of a Virginia statute requiring schools to post the national motto "In God We Trust" in every public school building (the "motto statute").[4]

More specifically, Myers claims that the pledge statute facially, and both statutes as applied by the School, violate his and his children's rights as protected by the First Amendment to the United States Constitution. In fact, Myers claims that his and his children's rights are violated because these statutes and the manner in which they are applied by the School (1) establish, "civil religion of God and Country" as a state supported religion; and (2) prevent he and his children from freely exercising their Anabaptist Mennonite religion, which specifically forbids "worship" of a secular state because such worship is "idolatrous."

In his Complaint, Myers requests injunctive and declaratory relief against the School.[5] In response, the School brings

1. Although styled as a Complaint against the "Loudoun County Public Schools," the parties now agree that the proper name of this Defendant is the "Loudoun County School Board."

2. The parties have now agreed that Defendant Hatrick should not be a party to this suit. Consequently, the Court orally granted Defendant Hatrick's motion to dismiss the Complaint against him on January 10, 2003, in the hearing on this matter.

3. This statute provides in pertinent part:
   C. Each school board shall require the daily recitation of the Pledge of Allegiance in each classroom of the school division and shall ensure that the flag of the United States is in place in each such classroom. Each school board shall determine the appropriate time during the school day for the recitation of the Pledge. During such Pledge of Allegiance, students shall stand and recite the Pledge while facing the flag with their right hands over their hearts or in an appropriate salute if in uniform; however, no student shall be compelled to recite the Pledge if he, his parent or legal guardian objects on religious, philosophical or other grounds to his participating in this exercise. Students who are thus exempt from reciting the Pledge shall remain quietly standing or sitting at their desks while others recite the Pledge and shall make no display that disrupts or distracts others who are reciting the Pledge. School boards shall provide appropriate accommodations for students who are unable to comply with the procedures described herein due to disability. The school board's code of conduct shall apply to disruptive behavior during the recitation of the Pledge in the same manner as provided for other circumstances of such behavior.
   Va Code Ann. § 22.1–202(C).

4. This uncodified statute provides:
   § 1. Posting of certain statement in the public schools.
   All school boards in Virginia shall prominently post the statement "In God We Trust 'the National Motto, enacted by Congress in 1956' ", in a conspicuous place in each of their schools for all students to read.
   Va. Acts of Assembly, ch. 895, HB 108, SB 608 (approved May 17, 2002)

5. Specifically, Myers requests (1) that the pledge statute be declared unconstitutional;

this motion to dismiss. Additionally, the Commonwealth of Virginia brings a motion to intervene as of right in this action,[6] as well as a motion to dismiss this action under Rule 12(b)(6).

## II. Standard of Review

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint, *see Randall v. United States*, 30 F.3d 518, 522 (4th Cir.1994), and should be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *De Sole v. United States*, 947 F.2d 1169, 1177 (4th Cir.1991) (citations omitted); *see also Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

In passing on a motion to dismiss, "the material allegations of the complaint are taken as admitted." *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969) (citations omitted). Moreover, "the complaint is to be liberally construed in favor of plaintiff." *Id.* In addition, a motion to dismiss must be assessed in light of Rule 8's liberal pleading standards, which require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R.Civ.P. 8.

## III. Analysis

█ Myers articulates his challenges to the Virginia statutes, and the School's implementation thereof, via 42 U.S.C. § 1983, a statutory mechanism by which a private citizen may obtain monetary, declaratory or injunctive relief for the violation of his civil rights by a "person [acting] under color of any statute, ordinance, regulation, custom, or usage, of any State[.]" 42 U.S.C. § 1983. A school board is a "person" who may be held liable under section 1983. *See B.M.H. by C.B. v. Sch. Bd. of City of Chesapeake, Va.*, 833 F.Supp. 560, 564 n. 6 (E.D.Va.1993)(Clarke, J.).

In support of his section 1983 action, Myers claims three separate constitutional injuries. Specifically, Myers claims that (1) the pledge statute is unconstitutional on its face; (2) the pledge statute, as it is applied by the School, is unconstitutional; and (3) the motto statute, as it is applied by the School, is unconstitutional.[7]

Each of these three constitutional injuries is premised on Myers' theory that the statutes violate his and his children's rights under the First Amendment. In fact, Myers appears to challenge that the statutes and their application violate both the Establishment Clause and the Free Exercise Clause of the First Amendment.

The First Amendment to the Federal Constitution provides in relevant part that the government "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof;" U.S. Const. amend. I. Although originally applicable only to the federal government, the First Amendment and its protection for the freedom of religious worship is now

---

(2) that the School distribute a statement to all members of the School community explaining that pledge participation is optional; (3) that the School remove pledge participation as a criterion for determining whether students receive citizenship rewards; (4) that the School change the design of the national motto poster it employs; (5) that the School remove all flags from its property save one flagpole for each building it operates; and (6) that the school deny the Boy Scouts of America access to its facilities.

**6.** Myers expressed no objection to the Commonwealth's intervention in this matter and the Court orally granted the motion for intervention in the hearing on this matter on January 10, 2003.

**7.** Myers also appears to make some allegations concerning his fundamental right to raise his children and the ability of the Boy Scouts of America to access the School. The Court addresses these concerns as miscellaneous relief in section III–D of this Memorandum Opinion.

applicable to the states by operation of the Fourteenth Amendment. *See Zelman v. Simmons–Harris,* 536 U.S. 639, 122 S.Ct. 2460, 2465, 153 L.Ed.2d 604 (2002).

In fact, the First Amendment guarantees two distinct rights with respect to free religious worship. Specifically, the First Amendment guarantees that the government shall not (1) establish a religion (the "Establishment Clause"); and (2) prevent a citizen from freely exercising the religion of the citizen's choosing (the "Free Exercise Clause"). *See Brown v. Gilmore,* 258 F.3d 265, 273–74 (4th Cir.2001). Broadly stated, "[b]oth clauses are designed to protect religious liberty." *Id.* at 274 (citations omitted).

■ Challenges brought to the constitutionality of a statute, or application thereof, based on violation of the Establishment Clause are evaluated using the test announced by the Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Though several justices and other courts have criticized the test, and sometimes other formulations have been employed, *Lemon* remains binding law in this Circuit. *See Ehlers–Renzi v. Connelly Sch. of the Holy Child, Inc.,* 224 F.3d 283, 288 (4th Cir.2000). "Under *Lemon,* to withstand an Establishment Clause challenge, (1) a statute must have a secular legislative purpose; (2) its principal or primary effect must neither advance nor inhibit religion; and (3) it must not foster an excessive governmental entanglement with religion." *Brown,* 258 F.3d at 275 (citing *Lemon,* 403 U.S. at 612–13, 91 S.Ct. 2105).

■ In contrast, evaluation of a claim under the Free Exercise Clause requires a court to employ the following test: "if a law is neutral and of general applicability,

then it cannot violate an individual's Free Exercise rights regardless of its reasonableness even if it has the incidental effect of burdening the individual's practice of religion." *Brock v. Carroll,* 107 F.3d 241, 243 (4th Cir.1997)(citing *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)). With these concepts in mind, the Court now addresses the challenges Plaintiff makes against the School.

### A. Facial Challenge to the Pledge Statute.

■ Myers appears to claim in his Complaint that the pledge statute is unconstitutional on its face. More narrowly, Myers appears to claim that the pledge statute violates the Establishment Clause, because it creates and supports the state sponsored religion of "God and Country."

Myers' claim, as it relates to the pledge statute's impermissible state establishment of religion, is unique. Indeed, previous claims brought challenging the constitutionality of the pledge of allegiance as violative of the Establishment Clause focused on Congress' insertion of the phrase "under God" as establishing monotheism as a state sanctioned religion. *See Newdow v. United States Congress,* 292 F.3d 597, 599 (9th Cir.2002) *petition for reh'g en banc pending;* [8] *Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Township,* 980 F.2d 437, 439–40 (7th Cir.1992). In contrast, Myers objects to the Pledge in its entirety, not simply the phrase "under God."

In fact, Myers claims that the Commonwealth has subtly, slowly and surely instituted a state supported religion in violation of the Establishment Clause. Specifically, Myers claims that statutes like the pledge statute further the implementation of the

---

8. Although not squarely before it in this action, the Court specifically rejects the holding of the Ninth Circuit in *Newdow* and finds the

rationale of that decision entirely unpersuasive.

state sponsored religion which he interchangeably labels "civil religion," "civic religion" and "God and Country" religion (for purpose of convenience, the Court will refer to this singular concept as "civil religion").

Indeed, Myers asserts that civil religion operates analogously to most sectarian religions. In drawing the particular analogy, Myers observes (1) that the tenets of civil religion are recorded for posterity in a variety of songs, writings, oaths and other assertions of devotion; (2) that these tenets are inculcated by ritual recitations of the of the words which define them; and (3) that the virtues and mores which underlie the tenets of this civil religion are preached to the children entrusted to the care of the Commonwealth in the Commonwealth's public schools.

In response, the School and the Commonwealth describe Myers' claim as "make-believe" and the product "of scholars' or college professors' opinions." (School's Mem. in Support at p.19; Commonwealth's Reply Mem. at p.7). But the Defendants' belittling of Myers' argument is plainly inappropriate. Indeed, no less an authority than the Supreme Court has recognized the existence of a civil religion conceptually identical to that which is described by Myers. *See Lee v. Weisman,* 505 U.S. 577, 589, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)("there has emerged in this country a civic religion, one which is tolerated when sectarian exercises are not.")(citing Yehudah Mirsky, Note, *Civil Religion and the Establishment Clause,* 95 Yale L.J. 1237 (1986)).[9] Moreover, several other federal courts have recognized the concept of a civil religion. *See Coles ex. rel. Coles v. Cleveland Bd. of Educ.,* 183 F.3d 538, 541 (6th Cir.1999)(stating that benedictions and invocations are proper so

long as they do not exceed the scope of "the American civil religion"); *Doe v. Santa Fe Indep. Sch. Dist.,* 168 F.3d 806, 827 (5th Cir.1999)(quoting language from *Lee* ); *Velasquez v. Frapwell,* 160 F.3d 389, 392 (7th Cir.1998) *vacated in part on other grounds,* 165 F.3d 593 (7th Cir.1999)(stating that "pacifism" was not "part of the Civil Religion of the United States."); *Stein v. Plainwell Cmty. Schs.,* 822 F.2d 1406, 1409 (6th Cir.1987)(stating that benedictions and invocations are proper so long as they do not exceed the scope of "the American civil religion" and specifically citing Mirsky, *supra.*); *Child v. United States,* 540 F.2d 579, 584 n. 9 (2d Cir.1976)(identifying burial of the dead as "a function of American 'civil religion' "); *Harris v. City of Chicago,* 218 F.Supp.2d 990, 993 (N.D.Ill.2002)(holding that city-planned public ceremony including prayers offered by religious leaders to mark first anniversary of September 11th attacks did not equate to establishment of "civil religion"); *Bronx Household of Faith v. Bd. of Educ. of City of New York,* 226 F.Supp.2d 401, 423 (S.D.N.Y.2002)(describing how the emergence of "civil religion" and "the blurring of boundaries between religious and secular ritual" have made difficult the task of distinguishing religious content from neutral content expressed from religious viewpoint); *Granzeier v. Middleton,* 955 F.Supp. 741, 744 (E.D.Ky.1997)(stating that "[s]ymbols of 'civil religion' ... such as legislative prayer," do not violate the Establishment Clause); *Griffith v. Teran,* 794 F.Supp. 1054, 1059 (D.Kan.1992)(stating that references to the Deity at public school functions "have, in effect, passed into 'the American civil religion.' "); *Am. Civil Liberties Union of Ky. v. Wilkinson,* 701 F.Supp. 1296, 1308 (E.D.Ky.1988)(stating

---

9. The article cited by the Court provides a rich history of the concept of civil religion, a phrase which was first coined by sociologist Robert Bellah in 1967. *See* Mirsky *supra.* at p.1247.

that one plausible interpretation of the Establishment Clause "recognize[s] an area of 'civil religion' in which practices apparently religious, such as a city's name being Corpus Christi, would be recognized as historical or traditional and not a violation of the Establishment Clause."); *Greater Houston Chapter of Am. Civil Liberties Union v. Eckels,* 589 F.Supp. 222, 227 (S.D.Tex.1984)(describing city's use of prominent Christian and Jewish symbols in a planned "war memorial" as an attempt to create a "water[ed] down . . . civil religion"); *Citizens Concerned for Separation of Church and State v. City & County of Denver,* 526 F.Supp. 1310, 1313 (D.Colo.1981)(stating that the "American civil religion" was exemplified by "prayers in legislative halls and the motto 'In God We Trust' on coins.").

But no court that has acknowledged the existence of a civil religion has ever found that government sponsored activities that encourage patriotism violate the Establishment Clause. *See id.; see Lee,* 505 U.S. at 589, 112 S.Ct. 2649. In fact, the Supreme Court observed that the acknowledgment, use and implementation of tools promoting civil religion is wholly in keeping with the Establishment Clause. *See Lee,* 505 U.S. at 589, 112 S.Ct. 2649.

Importantly, the notions of civil religion and traditional or sectarian religion are separable. *See id.* at 607, 112 S.Ct. 2649 (Blackmun, J. concurring). As Justice Blackmun observed:

> Democracy requires the nourishment of dialog and dissent, while religious faith puts its trust in an ultimate divine authority above all human deliberation. When the government appropriates religious truth, it "transforms rational debate into theological decree . . . ." Those who disagree no longer are questioning the policy judgment of the elected but the rules of a higher authority who is beyond reproach.

*Id.* (quoting Neuchterlein, Note, *The Free Exercise Boundaries of Permissible Accommodation Under the Establishment Clause,* 99 Yale L.J. 1127, 1131 (1990)).

In this case, the civil religion purportedly advanced by the pledge statute is wholly intended to inspire respect for country and constitutional ideals, by having students gather and in one voice recite a brief statement of those ideals. The reference to the Deity in such proclamations is theologically benign. Indeed, it has so often been repeated—now by three generations of schoolchildren—that any theological meaning it may once have had, has largely been eviscerated following years of rote recital. *See Lynch v. Donnelly,* 465 U.S. 668, 716, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)(Brennan, J. dissenting). In fact, the following observation by Justice Brennan in 1984 likely rings more true today, than when first written:

> I would suggest that such practices as the designation of "In God We Trust" as our national motto, or the references to God contained in the Pledge of Allegiance can best be understood, in Dean Rostow's apt phrase, as a form a "ceremonial deism," protected from Establishment Clause scrutiny chiefly because they have lost through rote repetition any significant religious content.

*Id.* (citation and footnote omitted).

Not only is recitation of the pledge free enough from sectarian color, so as to conclusively qualify as secular, the statute makes clear that it is not forcing acceptance of the beliefs contained in the pledge on any student. Specifically, the statute reads: "no student shall be compelled to recite the Pledge if he, his parent or legal guardian objects on religious, philosophical or other grounds to his participating in this exercise." Va.Code Ann. § 22.1–202(C). Therefore, the statute is in line with the Supreme Court's holding that

compelling a student to recite the pledge under threat of expulsion from school "transcends constitutional limitations on [the state's] power and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

Having set the terms and bounds of the argument before it, the Court now turns to application of the *Lemon* test. First, the Court observes that the pledge statute has a secular purpose, namely the fostering and inspiration of (1) patriotism, (2) love of country and (3) respect for constitutional principles. *See Wallace v. Jaffree,* 472 U.S. 38, 78, n. 5, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985)(O'Connor, J. concurring). Indeed, these goals are necessary to the preservation of democracy, and are not attempts to justify the existence of that democracy by invoking the imprimatur of the Divine. *See Lee,* 505 U.S. at 607, 112 S.Ct. 2649 (Blackmun, J. dissenting) Even accounting for the inclusion of a reference to the Deity, the recitation of the pledge is a secular activity, not a religious activity.

Similarly, the pledge statute does not "advance or inhibit" religion. Indeed, "[t]he effect prong asks whether, irrespec-

tive of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval [of religion]." *Wallace,* 472 U.S. at 56 n. 42, 105 S.Ct. 2479 (quoting *Lynch,* 465 U.S. at 690, 104 S.Ct. 1355, (O'Connor, J., concurring)). In this case, the practical message of the pledge is that the speaker supports the political ideologies on which this country is founded.[10] Moreover, the speaker is free to refrain from expressing such agreement. Therefore, the statute itself practically conveys no religious message, and at most it conveys a message of government appreciation, which pupils are free to disclaim. Consequently, the pledge statute neither advances nor inhibits religion.

In large part, Myers rests his argument on the theory that the state's excessive indulgence in codifying patriotic displays, particularly those tinted with expressions about God, has so excessively entangled the concepts of religion and the secular, that the state has created a sort of religion of itself, by itself and for itself.[11] But Myers' framing of the Commonwealth's action as establishing a *de facto* patriotic religion, is unpersuasive to this Court.

In fact, this Court believes that the line between the religious and the secular, as drawn by Justice Blackmun in *Lee,* remains a useful and poignant tool for determining whether an idea or action is secular

---

10. That Myers objects to these ideologies on religious grounds does not mean that the statute inhibits religion. Indeed, in assessing an individual's religious-based sensitivities to a particular statute, the court should find that the statute inhibits religion only if the statute was specifically designed to extinguish some particular religious practice. *See Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 879, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)(Souter, J. dissenting). No such allegation is made in this Complaint.

11. The parallel construction with President Abraham Lincoln's Gettysburg Address is both intentional and apropos. Indeed, a per-

son could argue, and the Court is certain Mr. Myers would agree, that President Lincoln's Gettysburg Address—as well as his famed second inaugural address—contained authoritative statements that the fate of the American Union rested then, as it did in the past, and would in the future, in the hands of the Divine. Yet, schoolchildren throughout the country are made to learn and recite Lincoln's Gettysburg Address as part of their American History curricula. To adopt Mr. Myers argument today would be to invalidate all such requirements as violative of the Establishment Clause. The Court believes that would be an inappropriate result.

or religious. In this case, the statute mandating recitation of the pledge is secular, because it aims to foster democracy, which is both necessary to the survival of the concept and entirely independent of the religious. Therefore, because the pledge statute is not excessively entangled with religion, and because it has passed the other prongs of the *Lemon* test, the Court concludes that the pledge statute does not violate, on its face, the Establishment Clause of the First Amendment.

### B. As Applied Challenge to the Pledge Statute.

■ Myers next argues that the actions of the School, in enforcing and applying the pledge statute to its students, violates the Free Exercise Clause of the First Amendment.[12] In general, Myers' grievance appears to be that his children are coerced by the School into reciting the pledge and thereby abandoning their religious beliefs. (*See* Complaint at ¶¶ 6–8).

In particular, Myers objects to the manner in which the pledge statute requires his children to stand, salute and pledge allegiance to the flag, an exercise he characterizes as "idolatrous." *See id.* at ¶ 6. In fact, although the statute itself unambiguously states that no child may be compelled to recite the pledge, Myers claims that through a system of reward and punishment, the School effectively coerces participation in the pledge recitation. *See id.* at ¶¶ 8(B), 8(G).

Specifically, Myers alleges that students who stand and recite the pledge are rewarded because a program sponsored by the School rewards patriotism, including reciting the pledge of allegiance, with cou-

pons for Chick–Fil–A meals. *See id.* at ¶ 8(G). Furthermore, Myers claims that the School punishes his children for their failure to participate in the pledge via a number of indirect coercive actions. *See id.* at ¶ 8(B).

As to the "reward" program and whether its application violates the Free Exercise Clause, the Court begins its analysis by asking whether the program is "neutral and of general applicability[.]" *See Brock,* 107 F.3d at 243 (citing *Smith,* 494 U.S. 872, 110 S.Ct. 1595). In reviewing the facts as plead in the Complaint, Myers states that the "reward" program is School-wide and that it is aimed at the overall goal of encouraging good citizenship. (See *Complaint* at ¶ 8(G)). Moreover, Myers confirms that the recitation of the pledge is but one element in the calculus that determines whether a student receives the "reward." *See id.*

Tellingly, Myers does not allege that the reward is distributed solely on the basis of pledge participation, nor does he allege that the reward system was designed specifically to coerce students to recite the pledge. *See id.* Consequently, because the reward program is neutral and generally applicable, this Court must find that the reward program "cannot violate an individual's Free Exercise rights regardless of its reasonableness even if it has the incidental effect of burdening the individual's practice of religion." *See Brock* 107 F.3d at 243 (citation omitted).

Turning to the punishment aspect of Myers' claim and whether it violates the Free Exercise Clause, the Court begins by precisely defining the term "punishment"

---

12. Myers' claim does not directly reference the Free Exercise Clause, but the claims raised in Paragraphs 6–8 indicate Myers' belief that his and his children's exercise of their faith is compromised and limited by the School's application of the pledge statute.

Thus, reading the *pro se* plaintiff's claim liberally, this Court will analyze his claim not only under the Establishment Clause allegation specifically mentioned, but also the Free Exercise Clause impliedly stated in the Complaint.

in this context. Initially, the Court notes that the dictionary defines the term "punishment" as "[a] penalty imposed for wrongdoing.... Rough handling; mistreatment." *The American Heritage Dictionary* 1469 (3d Ed.1992).

More specifically, in the context of the schoolhouse, the Supreme Court has recognized that while most forms of punishment are permissible and do not implicate constitutional protections, some forms of punishment are so serious that they rise to the level of constitutional violation. *See New Jersey v. T.L.O.,* 469 U.S. 325, 385, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985)("Although I agree that school administrators must have broad latitude to maintain order and discipline in our classrooms, that authority is not unlimited")(Brennan, J. concurring in part, dissenting in part). Specifically, the Court has recognized that expulsion from school, suspension from school and physical restraint and infliction of physical pain by school officials triggers constitutional review of the school's chosen punishment. *See Barnette,* 319 U.S. at 629, 63 S.Ct. 1178 (punishment of expulsion for failure to recite pledge warranted first amendment review); *Goss v. Lopez,* 419 U.S. 565, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)(punishment of 10–day suspension mandated due process protections guaranteed by Fourteenth Amendment); *Ingraham v. Wright,* 430 U.S. 651, 674, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977)(punishment of "restraining the child and inflicting appreciable physical pain" warranted review under Fourth Amendment as incorporated by Fourteenth Amendment).

However, the punishment Myers identifies in his Complaint is not similar to any of the traditional punishments recognized as implicating constitutional rights. Instead of stating that his children were expelled, suspended, restrained or paddled, Myers claims that his children were exposed to a form of school sponsored and orchestrated expression, which he found objectionable on the basis of his religious convictions.

In particular, Myers alleges that "[a]dministrators demand that students rise and participate in the pledge ritual. Children who do not are disciplined until students or parents express an acceptable objection to the pledge." (Complaint at ¶ 8(B)). To be certain, Myers has exercised his rights under the statute and has expressed to the School that he does not want his children to stand during the pledge and they no longer rise during the pledge.[13] (*See* Hrg. Tr. at 9:6–10:6, Jan. 10, 2003). Rather, Myers asserts that his children are harmed because (1) they remain seated during the pledge while the rest of their classmates stand; (2) they are forced to listen to the pledge; and (3) the School has not given Myers an adequate opportunity to explain to his children's classmates and their parents why his children choose to remain seated during the pledge. (*See* Complaint at ¶¶ 8(A)-(C)).

The first of these punishments suggests that Myers' children are psychologically coerced into accepting a state endorsement of religion that conflicts with their own religious convictions. In fact, the Supreme Court has recognized "that the government may no more use social pressure to enforce orthodoxy than it may use other more direct means." *Lee,* 505 U.S. at 594, 112 S.Ct. 2649. However, the differ-

---

**13.** To the extent that Myers' children were once made to stand during the pledge, there is no "case or controversy" between the parties. *See* U.S. Const. art. III. It is admitted by all parties now that Myers children remain seated during the pledge and that the School does not compel them to stand. Furthermore, the parties agree that once Myers voiced his objection to his children's standing during the pledge, the School fully complied with the statute and never hindered Myers' request.

ences between the unconstitutional religious exercises denounced in *Lee* and the allegations detailed in this Complaint are material and ultimately determinative of the issue.

Specifically, the Supreme Court held that the psychological coercion at work in *Lee* was that the school, by controlling and directing graduation activities, invoked its authoritative pressure—and facilitated student generated peer pressure—on all the students in attendance to stand or remain respectfully silent during an invocation and benediction given by a religious minister. *See id.* at 593, 112 S.Ct. 2649. The Court concluded that this social pressure was tantamount to coercing students to accept an undeniably religious message authorized by the school and therefore it violated the First Amendment's religious liberty protections. *See id.* at 593–94, 112 S.Ct. 2649.

In this case, however, both the content of the complained of message and the medium through which it is delivered are substantially different than the message and medium discussed by the Court in *Lee*. Specifically, in *Lee*, the message delivered was undoubtedly a prayer. *See id.* at 581–83, 112 S.Ct. 2649. In contrast, in this case the message delivered was the pledge of allegiance, which this Court holds is a secular statement and not a religious prayer. Furthermore, in *Lee*, the message was given by a sectarian minister. *See id.* at 581, 112 S.Ct. 2649. By comparison, in this case the pledge was recited by a group of elementary school children and their teacher. Because of these differences, this Court concludes that Myers' children were not psychologically coerced into accepting particular religious views authorized by the School.

Next, Myers claims that his children's free exercise rights are injured because they are punished when they are forced to listen to the pledge. However, Courts have refused to recognize that schools must shelter students from curricular messages to which the students have a religious objection. *Cf. Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 520 (9th Cir.1994)(school could constitutionally require the teaching of evolution, even though it offended religious beliefs of some).

Moreover, the Supreme Court affirmatively stated that in many circumstances students may be subjected to hearing messages authorized by the school, to which the students have moral and religious objections. Specifically, the Court stated:

> We do not hold that every state action implicating religion is invalid if one or a few citizens find it offensive. People may take offense at all manner of religious as well as nonreligious messages, but offense alone does not in every case show a violation. We know too that sometimes to endure social isolation or even anger may be the price of conscience or nonconformity.

*Lee,* 505 U.S. at 598–99, 112 S.Ct. 2649. Therefore, this Court cannot find that because Myers' children disagree with the secular message contained in the pledge that they are punished by having to listen to that message. Consequently, the Court finds that Myers' children do not have their free exercise rights curtailed by listening to the pledge.

Further, Myers complains that his children are effectively punished for their religious beliefs because the School "refuses to explain to students and parents that participating in the pledge ritual is optional." (Complaint at ¶ 8(B)). Myers complaint appears to be premised on the theory that the School has a duty to make certain that (1) each student's religious sensibilities are not offended by actions which may occur in the classroom; and (2) that if those beliefs are offended, that the

student and parent be given a forum to discuss and explain those religious convictions.

But the Court cannot find, nor will it imply, that the School owes its students such duties. Put plainly, the manner in which schools decide to implement and explain their curriculum and the other goings on in their classrooms is a matter left to the discretion of the school and the state and their elected representatives, not this Court. *Cf. Johnson v. Prince William County Sch. Bd.*, 241 Va. 383, 404 S.E.2d 209, 211 n. 4 (1991) (school board does not have to state its reasons for denying religious exemptions to students).

Moreover, in this particular case the pledge statute mandated only that, if students or parents objected to the recitation of the pledge, the school may not compel such recitation. *See* Va.Code Ann. § 22.1–202(C). Importantly, the statute did not require schools to notify students and parents of the optional nature of the pledge recitation. *See id.* Consequently, the School's failure to give such notice does not amount to any actionable violation of the School's duties to Myers and his children. Therefore, neither the failure to warn Myers of the nature of the law, nor the failure to give Myers a forum to explain his views, were punishments designed to restrict the free exercise of Myers' religion or that of his children.

In sum, both the reward and the punishment systems cited by Myers, inasmuch as those titles may be applied to the facts of this case, are "neutral and of general applicability." *Brock*, 107 F.3d at 243 (citation omitted). Indeed, the facts do not allege that either program was impermissibly designed to suppress Myers' or his children's free exercise of their religion. Therefore, the Court must uphold the challenged ap-

plication of the pledge statute by the School because it does not "violate an individual's Free Exercise rights regardless of its reasonableness even if it has the incidental effect of burdening the individual's practice of religion." *See id.*

## C. The Motto Statute

■ Myers' challenge to the motto statute is an "as applied" challenge to the School. In fact, Myers admitted that he does not challenge the facial validity of the motto statute. Rather, Myers claims that the School's compliance with the motto statute violates the First Amendment because the School "posts the national motto using a God and Country religious design supplied by a conservative religious group." (Complaint at ¶ 8(E)). In redress of this purported violation, Myers asks that the Court order the School to "[r]eplace the national motto poster installed in each school with a religiously neutral design that does not use the flag in the design and clearly identifies that the words 'In God We Trust' is the national motto [*sic*] and not a declarative religious statement." *Id.* at ¶ 12(D).

Although he implicates the entire First Amendment when classifying the nature of the constitutional violation that the School engaged in, Myers is plainly claiming that the motto display violates the Establishment Clause. Indeed, it appears as though Myers' claim is that because the School uses posters supplied by a religious group to display the motto "In God We Trust" the School is effectively establishing a religion.[14]

In general, the exchange of goods and services between public schools and religious organizations is guided by the bright line rule that public funds cannot be used

---

**14.** Myers' objection to the use of the flag on the posters presents no cognizable Establishment Clause claim. In fact, the flag is a wholly secular object that conveys no observable religious message.

to directly support religious education; *see Zelman*, 122 S.Ct. at 2465 (citations omitted). However, the converse query presents a more unique question. Indeed, the question in this case asks whether a school may accept a donation of a secular item for use in its school. In particular, the question focuses on whether the school may accept posters from a religious group bearing the slogan "In God We Trust: The National Motto Enacted by Congress in 1956" emblazoned over an out-of-focus and cropped photograph of a waving American flag.

■ To be certain, the First Amendment prohibits the school from accepting religious material from religious groups and displaying it or distributing it to students as an official publication of the school. *See Washegesic v. Bloomingdale Pub. Schs.*, 33 F.3d 679, 683 (6th Cir.1994)(holding that a school's display of a portrait of Jesus in a prominent school hallway violated the Establishment Clause); *see also Sch. Dist. of Abington Township. v. Schempp*, 374 U.S. 203, 223, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963)(holding that schools may not compel students to join in readings from the Bible). However, no court has established any rule that bans the use of private religious to support secular activities in public schools.

To the contrary, the Fourth Circuit has held that schools can grant access to their facilities during school hours to private religious groups and allow those groups to distribute religious materials to students. *Peck v. Upshur County Bd. of Educ.*, 155 F.3d 274, 279 (4th Cir.1998). Indeed, the Fourth Circuit held that a neutral school policy that allowed any non-school groups to distribute literature to students during school hours did not violate the Establishment Clause when it was applied to allow a religious group to distribute Bibles to students during the school day. *See id.* at 279–80.

Moreover, the Fourth Circuit held that the mere fact that the group accessing the school and distributing its materials was religiously motivated, did not equate to a state endorsement of those or any religious principles. *See id.* at 281. Specifically, the Fourth Circuit stated:

Nor is the fact that [the religious group's] request to offer the Bibles was religiously motivated ultimately relevant to our inquiry as to the permissibility of the Board's action. We do not impute an impermissible purpose to advance religion to an elected official merely because he responds to a religiously motivated constituent request.

*Id.*

In this case, Myers claims that a religious group responded to the School's need for National Motto posters, as mandated by state statute, by providing the school with religiously themed posters.

To begin with, the posters at issue are secular and not religious. Indeed, aside from the inclusion of the word "God" as a portion of the national motto, the posters are wholly devoid of any religious reference or symbolism. Furthermore, the national motto's reference to God does not make the statement religious as opposed to secular. *See Aronow v. United States*, 432 F.2d 242, 243 (9th Cir.1970)("It is quite obvious that the national motto and the slogan on coinage and currency 'In God We Trust' has nothing whatsoever to do with the establishment of religion."); *Gaylor v. United States*, 74 F.3d 214, 216 (10th Cir.1996) ("The motto symbolizes the historic role of religion in our society ... formalizes or medium of exchange ... fosters patriotism ... and expresses confidence in the future."); *see also County of Allegheny v. Am. Civil Liberties Union*, 492 U.S. 573, 602–03, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) ("Our previous opinions have considered in dicta the motto and the

pledge, characterizing them as consistent with the proposition that government may not communicate an endorsement of religious belief.").

Likewise, the fact that the poster was designed by a religious group does not make the poster religious in nature. Indeed, absent any allegation that the poster contains any objectively religious theme, the court may not infer that because the designers may have been religiously motivated, that the design itself is religiously themed. *Cf. Peck*, 155 F.3d at 281 (religiously neutral policy is not unconstitutionally poisoned by motives of those operating under the policy). Therefore, the Court concludes that the School's application of the motto statute, in particular the use of the posters supplied by an allegedly religiously motivated group, does not offend the Establishment Clause of the First Amendment.

### D. Miscellaneous Relief

Throughout his Complaint, the pro se plaintiff lists several grievances which do not articulate any particular claim. Nevertheless, the Court reads the pro se plaintiff's Complaint liberally and addresses two possible claims that may be implied from the Complaint.

*1. Violation of Fundamental Right to Direct the Upbringing of One's Children.*

The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV. The Supreme Court has extrapolated from this text two separate and distinct rights: (1) procedural due process, which guarantees that the state will not deprive a person of life, liberty or property without engaging in some review of its decision to do so; *see Mathews v. Eldridge,* 424 U.S. 319, 322, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); and (2) substantive due process which prevents

the state from encroaching upon rights that are "fundamental" or "implicit in the concept of ordered liberty." *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937).

■ Among the fundamental rights protected in the substantive due process shelter of the Fourteenth Amendment is the right to "bring up children" as one sees fit. *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). However, this fundamental right is not unbounded. Indeed, the state legitimately can impose restraints and requirements that touch the lives of children in direct conflict with the wishes of their parents. *See Bellotti v. Baird* 443 U.S. 622, 639 n. 18, 99 S.Ct. 3035, 61 L.Ed.2d 797 ("constitutional parental right" to direct upbringing of one's child protects only "against undue, adverse interference by the State.").

With respect to potential conflicts between the state's duty to make certain that its citizens are educated and the parents' rights to direct the upbringing of their children, two general rights have emerged: (1) the state cannot mandate that children attend only public schools; *see Pierce v. Soc'y of Sisters,* 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); and (2) the state cannot mandate that children of sufficient maturity attend school at all, when school attendance would conflict with a religious belief. *See Wisconsin v. Yoder,* 406 U.S. 205, 214–15, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

Importantly, the fundamental right of parents to guide the upbringing of their children, when juxtaposed with the state's duty to provide for the education of its citizens, reveals that the parental rights safeguarded by the Constitution in this context are especially cumbrous. Specifically, the parental right is limited to the coarse decision of whether to enroll a child in a public school, private school, or if the

child is sufficiently mature, to dis-enroll a child from school altogether. *See Pierce*, 268 U.S. at 535, 45 S.Ct. 571; *Yoder* 406 U.S. at 235, 92 S.Ct. 1526;

In contrast, finer pedagogical decisions are left to the school and its administrators. *See Boring v. Buncombe County Bd. of Educ.*, 136 F.3d 364, 369–71 (4th Cir. 1998). Indeed, as Justice Frankfurter observed, such decisions are part of "the four essential freedoms of a [public school[15]]: to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study". *Sweezy v. New Hampshire*, 354 U.S. 234, 255, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); *see also Brown v. Hot, Sexy and Safer Prods.*, 68 F.3d 525, 533–34 (1st Cir.1995) ("We think it is fundamentally different for the state to say to a parent, 'You can't teach your child German or send him to a parochial school,' than for the parent to say to the state, 'You can't teach my child subjects that are morally offensive to me.'").

■ In this case, Myers essentially seeks to refine the School's curriculum in a manner that would accommodate his attempts to raise his children in the religious faith of his choice. Specifically, Myers alleges that the School "undermines Plaintiff's right to direct the religious education of his children by promoting a 'God and Country' religious worldview in classroom patriotic curriculum, in school policy, and in individual actions of staff and the School Board." (Complaint at ¶ 5). Moreover, Myers requests a number of forms of relief that would require the School to change its curriculum so that it comports with his personal religious beliefs and those he wishes to pass to his children. *See id.* at ¶¶ 12(A)-(C).

Indeed, Myers seeks to exercise his fundamental right to direct the religious upbringing of his children by having this Court dictate to the School what its curriculum should and should not contain. Importantly, Myers is not seeking to enroll or dis-enroll his children from the School based on the tenets of his religious faith, but rather he is seeking to design the School curriculum around his religious faith. However, the fundamental right to raise one's children as one sees fit is not broad enough to encompass the right to re-draft a public school curriculum. *See Brown*, 68 F.3d at 534. Therefore, Myers fails to state a claim that the School has violated his fundamental right to direct the religious upbringing of his children.

### 2. The Boy Scouts of America

■ Myers claims that the School "invites the Boy Scouts of America ['BSA'] to personally recruit students from elementary classrooms. BSA chapters are God and Country evangelists." (Complaint at ¶ 8(D)). Furthermore, Myers requests that this Court order the School to "[d]eny Boy Scouts of America (and similar organizations) the opportunity to recruit students in the classroom during school hours." *Id.* at ¶ 12(F).

Construing the *pro se* plaintiff's claim liberally, it appears that Myers claims that the School's decision allowing the BSA access to the school and its students is an impermissible establishment of religion. However, as discussed in section III–C of this Memorandum Opinion, the Fourth Circuit has held that if a school implements a neutral policy, it may allow private groups access to students. *See Peck*, 155 F.3d at 279. In this case, the School was merely complying with the federal

---

**15.** Justice Frankurter's remarks were directed not at a public primary or secondary school, but at a university. However, the Fourth Circuit held that "the four essential freedoms of a university ... should no less obtain in public schools unless quite impracticable or contrary to law[.]" *Boring*, 136 F.3d at 370.

mandate that public schools supported by federal education funds may not deny access to groups affiliated with the BSA. Specifically,

> [n]otwithstanding any other provision of law, no public elementary school, public secondary school, local educational agency, or State educational agency that has a designated open forum or a limited public forum and that receives funds made available through the Department [of Education] shall deny equal access or a fair opportunity to meet to, or discriminate against, any group officially affiliated with the Boy Scouts of America[.]

20 U.S.C. § 7905.

Moreover, even if the BSA were a religiously motivated entity, simply providing it access to a public forum is not an establishment of religion. *See Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 395, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993).

Indeed, no allegation is contained in the Complaint that membership in the BSA is part of the School's required curriculum, or that any portion of the school day is devoted to the BSA's "recruit[ment]" activities. (*See* Complaint at ¶ 8(D)). Rather, Myers claims that the BSA should be banned from the School's building altogether because of his belief that they are "God and Country evangelists." *See id.; see also id.* at ¶ 12(F).

However, Myers claims do not rise to the level of a constitutionally actionable tort. In fact, because Myers' only claim is that access should not be provided to the BSA, and because the Supreme Court has held that merely providing access to a school does not violate the Establishment Clause, Myers fails to state a claim for relief that this Court can grant.

## IV. Conclusion

For the foregoing reasons, the Court finds that Myers has not stated a claim for violation of either the First or Fourteenth Amendments actionable under section 1983. Therefore, the Court will GRANT the Defendants' Motion to Dismiss under Rule 12(b)(6). An appropriate Order will issue.